748 So.2d 594 (1999)
CUSTOM-BILT CABINET & SUPPLY, INC., Plaintiff-Appellee,
v.
QUALITY BUILT CABINETS, INC., Larry Wayne Hattaway and David Randal Peters, Defendants-Appellants.
No. 32,441-CA.
Court of Appeal of Louisiana, Second Circuit.
December 8, 1999.
*596 Burnett, Walker & Baker by Glen Walker, Shreveport, Counsel for Appellant David Peters.
Simon, Fitzgerald, Cooke, Reed & Welch by Chatham H. Reed, Shreveport, Counsel for Appellant Larry Hattaway.
Byram & McCarthy by John McCarthy, Counsel for Appellee.
Before GASKINS, KOSTELKA and DREW, JJ.
GASKINS, Judge.
David Randal Peters appeals from a city court judgment finding him liable on a continuing guaranty for a debt owed by Quality Built Cabinets, Inc. to the plaintiff, Custom-Bilt Cabinet & Supply Company, Inc. For the following reasons, we affirm the trial court judgment.

FACTS
In 1994, David Peters and Larry Wayne Hattaway opened a business known as Quality Built Cabinets, Inc. (Quality Built). *597 They frequently purchased supplies and materials from Custom-Bilt Cabinet and Supply Company Inc. (Custom-Bilt) on open account. Peters and Hattaway executed a continuing guaranty to Custom-Bilt to secure payment for the purchases. In 1996, Peters thought his family would be required to relocate out of state due to his wife's employment. Hattaway purchased Peters' interest in Quality Built. However, Peters did not leave the state and opened his own personal account at Custom-Bilt to purchase materials. He did not resume his co-owner relationship with Hattaway at Quality Built. Later, Quality Built fell into arrears in payment of its debt to Custom-Bilt.
On May 28, 1998, Custom-Bilt filed suit on open account against Quality Built, Hattaway, and Peters, contending that Quality Built purchased $8,766.40 in materials from December 3, 1997 to February 23, 1998 and failed to pay. Custom-Bilt sought to recover against Peters and Hattaway personally by virtue of the continuing guaranty. Peters and Hattaway answered the petition, but Quality Built did not. On July 13, 1998, a default judgment was taken against the corporation, ordering it to pay Custom-Bilt $8,766.40, with legal interest and attorney fees in the amount of $1,250.
Peters argued that he was not liable on the continuing guaranty. In his answer to the petition, Peters contended that in May 1996, Hattaway purchased his share of Quality Built. The sale was memorialized in a document executed August 9, 1996. Peters also alleged that after the sale of his interest in the corporation, he worked on his own and not with Hattaway. According to Peters, at the time he sold his interest in Quality Built to Hattaway, he contacted Custom-Bilt and learned that the credit balance for Quality Built was zero. He also alleged that he told those working in the financial department of Custom-Bilt that he was no longer responsible for any debts owed by Quality Built. Peters claimed that his responsibility on the continuing guaranty was canceled by the sale of his interest in Quality Built to Hattaway.
On the day of trial, October 29, 1998, Peters filed a cross-claim against Hattaway and Quality Built. Peters denied personal liability on the debt, but in the event he should be found liable on the debt, he sought to recover against Quality Built as the principal obligor and sought indemnity and/or contribution against Hattaway. It was noted that Hattaway was in the process of filing personal bankruptcy. After hearing the evidence adduced, the trial court determined that there was a continuing guaranty which was clear and unambiguous. The court also found that there was no clear and unequivocal showing that the continuing guaranty had been revoked. At the close of the hearing, the court stated on the record that, regarding the cross-claim by Peters, Hattaway would be liable on the debt, but a specific judgment against Hattaway was not pronounced. No mention was made as to whether Peters should have been entitled to indemnity from Quality Built. On October 30, 1998, Hattaway filed for bankruptcy, instituting an automatic stay as to other court proceedings involving him.
Peters objected to the ruling of the trial court and several letters were passed between counsel for the parties and the court. A judgment was signed on November 4, 1998, granting recovery to Custom-Bilt against Peters for $8,766.40, with legal interest from the date of default and attorney fees in the amount of 25% of the amount to be collected, plus costs. The rights of Custom-Bilt and Peters against Hattaway were reserved. Also, Peters' rights against Quality Built were reserved.
Peters filed a motion for written reasons for judgment and findings of fact. The court took no action on this motion. Peters also filed a motion to reopen the case, to take evidence on Hattaway's bankruptcy filing and evidence on the attorney fee issue. In addition, Peters filed a motion for new trial, claiming that the judgment *598 in this case was contrary to the law and the evidence. Peters also alleged in the alternative that Hattaway's filing for bankruptcy would affect the form of judgment and a new trial was necessary to address that issue. The motion for new trial bears a handwritten notation that it was denied, but it does not contain the trial judge's signature or initials.
On November 19, 1998, Peters filed a motion for appeal. He claims that the trial court erred in finding that there was a binding continuing guaranty agreement in this case and that the trial court erred in finding that the guaranty agreement had not been revoked. He also claims that the trial court erred in awarding attorney fees and erred in failing to file written reasons for judgment, as requested. Peters claims that the trial court issued an improper partial final judgment by failing to rule upon the cross-claim against Hattaway and Quality Built. He further contends that because the trial court did not rule on his motion for new trial, this matter is more properly considered as a writ application and not an appeal.

WRIT OR APPEAL
Peters first raises a procedural issue as to whether this matter should be considered as an appeal or a writ application. The judgment in this case was signed, but the denial of the motion for new trial was not. Someone merely wrote the word "denied" on the order and filed it with the clerk's office. Peters contends that this raises the issue of whether the appeal delays have actually commenced. He contends that if the delays have not commenced, this matter may be more properly termed a writ application, rather than an appeal. However, Peters conceded that under either theory, the matter is properly before this court for review. Custom-Bilt contends that this is a "non-issue" and there is no need to discuss whether this is an appeal or a writ.
We find that the lack of a judge's signature on the denial of the motion for new trial is of no moment. The denial of a motion for new trial may be made by minute entry and does not require a signed judgment. La. C.C.P. art. 1914; Chamberlain v. Burcham, 624 So.2d 20 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1175 (La.1993); Gregory v. D & H Enterprises, 97 1039 (La.App. 3d Cir.10/9/97), 702 So.2d 927, writ denied, 97-2844 (La.1/30/98), 709 So.2d 714; Ducote v. Smith, 527 So.2d 75 (La.App. 3d Cir.1988).

CONTINUING GUARANTY
Peters argues that the trial court erred in finding that the continuing guaranty in this case is clear and unambiguous. Peters claims that the agreement is ambiguous and in it, he merely assents to pay Custom-Bilt whatever he owes, not what Quality Built owes. Peters points out that, in instances of ambiguity, there is a strong presumption against suretyship. He also argues that ambiguity in the agreement should be construed against the drafter of the guaranty, Custom-Bilt.
Contracts of guaranty are subject to the same rules of interpretation as contracts in general. The courts are bound to give legal effect to all written contracts according to the true intent of the parties and this intent is to be determined by the words of the contract when these are clear, explicit and lead to no absurd consequences. The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. However, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity and to show the intent of the parties. American Bank and Trust Company in Monroe v. Vinson, *599 528 So.2d 693 (La.App. 2d Cir.1988); Hardware Wholesalers, Inc. v. Guilbeau, 473 So.2d 108 (La.App. 3d Cir.1985). The determination of whether a contract is clear or ambiguous is a question of law. Louisiana Insurance Guaranty Association v. Interstate Fire and Casualty Company, 93-0911 (La.1/14/94), 630 So.2d 759.
A contract of guaranty is equivalent to a contract of suretyship and the two terms may be used interchangeably. Bank of Coushatta v. Patrick, 503 So.2d 1061(La.App. 2d Cir.1987), writ denied, 506 So.2d 1231 (La.1987); Commercial National Bank v. Rowe, 27,800 (La.App.2d Cir.1/24/96), 666 So.2d 1312. Therefore, the provisions of the civil code governing the contract of suretyship may be examined in testing whether there is a continuing guaranty. Ball Marketing Enterprise v. Rainbow Tomato Co., 340 So.2d 700 (La.App. 3d Cir.1976). Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so. La. C.C. art. 3035. A continuing guaranty is equivalent to a contract of suretyship and is intended to secure the indebtedness of another. American Bank and Trust Company of Houma v. Wetland Workover, Inc., 523 So.2d 942 (La.App. 4th Cir.1988), writs denied, 531 So.2d 282, 283 (La.1988). Suretyship must be express and in writing. La. C.C. art. 3038.
A general rule which emerges from the substantial body of jurisprudence interpreting these provisions is that the surety's contract need not observe technical formalities, but must contain an absolute expression of intent to be bound. Ball Marketing Enterprise v. Rainbow Tomato Co., supra.
The continuing guaranty in this case is part of a credit application on behalf of Quality Built, with Peters and Hattaway listed as the co-owners. The language of the guaranty is as follows:
In consideration of CUSTOM-BILT CABINET & SUPPLY, INC. extending credit to the above applicant, [Quality Built] a corporation, the undersigned does hereby individually and personally guarantee to CUSTOM-BILT CABINET & SUPPLY, INC. or their assigns the payment of such sums of money now owning or anytime due by me to said company, whether individually, partnership, or corporation. I (or WE) apply for credit and will abide by the terms and conditions of CUSTOM-BILT CABINET & SUPPLY, INC. The information furnished is accurate and complete to the best of my (or OUR) knowledge. If it becomes necessary to enforce this guaranty by suit, I agree to pay interest as allowed by law and reasonable attorney's fees, which are hereby fixed at 25% of the amount to be collected.
Peters argues that the language "due by me" guarantees only payment of his personal debt to Custom-Bilt and not any debt that Quality Built might owe. We reject this reasoning. Peters would have us ignore the remainder of the sentence in question, which promises to pay all sums "due by me" to Custom-Bilt, whether individually, partnership, or corporation. Further, there was no dispute at the time the agreement was signed that it was intended as a continuing guaranty. Therefore, we find that the trial court did not err in finding that the language contained in the credit application was a continuing guaranty which was signed by Peters, binding him for the debts incurred by Quality Built.

REVOCATION OF GUARANTY
Peters next questions whether the continuing guaranty was revoked before the debt sued upon herein was incurred. Peters argues that in 1996, he told officials at Custom-Bilt that he was no longer associated with Quality Built, the billing address for Quality Built was changed from Peters' home address to the actual place of business operated by Hattaway, and Peters opened his own line of credit and began to use it. Peters contends that this *600 was sufficient to revoke the guaranty. According to Custom-Bilt, Peters did not provide them with documentation of the sale of his interest in Quality Built and did not request a cancellation of the guaranty until after the present charges were past due.
The law is well settled that a continuing guaranty remains in force until revoked by the guarantor, expressly or impliedly; or its effectiveness is extinguished in some other mode recognized by law. Hardware Wholesalers, Inc. v. Guilbeau, supra; Bank of Coushatta v. Patrick, supra.
La. C.C. art. 3061 provides in pertinent part:
A surety may terminate the suretyship by notice to the creditor. The termination does not affect the surety's liability for obligations incurred by the principal obligor, or obligations the creditor is bound to permit the principal obligor to incur at the time the notice is received, nor may it prejudice the creditor or principal obligor who has changed his position in reliance on the suretyship.
In the case of termination of the suretyship, notification that the suretyship is being terminated is necessary. First, it provides a point of reference from which one can determine what obligations the surety has incurred. Second, it places the creditor on notice that the surety will no longer be bound for future obligations of the principal debtor. This allows the creditor to make an informed decision as to whether he will continue to extend funds to the principal debtor. Whitney National Bank v. Zewe, 619 So.2d 729 (La.App. 4th Cir.1993), writ denied, 625 So.2d 1036 (La. 1993).
It is the responsibility of the guarantor to cancel the guaranty agreement, and further, to prove the cancellation. Security First National Bank v. Richards, 584 So.2d 1174 (La.App. 3d Cir. 1991).
Walter W. McCook, secretary-treasurer of Custom-Bilt and the person who handles credit for the business, testified that Peters gave him a copy of the sale of his interest in Quality Built only after the corporation's account became delinquent in 1998. McCook denied discussing the sale with Peters prior to that time.
Kenneth Lee Frizzel, the salesman with Custom-Bilt who handled the Quality Built account, testified that Peters told him several times that he was no longer involved in Quality Built. However, Frizzel was aware that Peters occasionally performed work for Quality Built after Hattaway purchased Peters' interest in the company. Frizzel also testified that Peters never asked him to tell McCook that Peters was not responsible for Quality Built's debts.
Peters testified that he saw McCook at Custom-Bilt on several occasions and told him that Hattaway had purchased his interest in the business. Peters also claims to have had several discussions with Frizzel in the summer of 1996 regarding the sale of his interest in Quality Built to Hattaway. However, Peters admitted that he never directly told anyone at Custom-Bilt that he did not expect to be responsible for the debts of Quality Built. He also stated that after Hattaway purchased his interest in Quality Built, he occasionally performed work for the company and was paid on an hourly basis.
The question is whether Peters notified Custom-Bilt of the cancellation of the guaranty and whether he carried his burden of proof at trial that he provided sufficient notification to cancel the suretyship. The testimony set forth above shows only that Peters notified a Custom-Bilt salesman, Frizzel, that he was no longer in business with Quality Built. We find that, under the jurisprudence, Peters' action in merely informing a salesman that he was no longer involved with Quality Built was not sufficient to revoke the continuing guaranty.
In Security First National Bank v. Richards, supra, a litigant sought to avoid *601 liability on a continuing guaranty by arguing that she had sold her shares of stock in the company that was the principal obligor. She argued that she was no longer liable on the continuing guaranty even though she did not notify the creditor of the sale of her interest in the company. The litigant stated that she thought some-one else had informed the creditor that she no longer owned an interest in the company. The litigant's actions were contrasted with those of another party who sold his stock in the company but also made a specific request to the creditor for cancellation of the guaranty. The court found that the complaining litigant was not released from the obligation under the continuing guaranty.
Similarly, in Commercial National Bank in Shreveport v. Keene, 561 So.2d 813 (La.App. 2d Cir.1990), a former partner sought to escape liability on a continuing guaranty by arguing that he had sold his interest in the partnership. In that case, this court held that a continuing guaranty is not revoked merely by notice to the creditor that a guarantor has sold his interest in a business entity to another who thereafter also signs a continuing guaranty.
Peters argues that notice to Frizzel that he was no longer involved with Quality Built, was sufficient to revoke the guaranty. In support of that contention, Peters cites Powell Lumber Company v. Afco Corporation, 288 So.2d 697 (La.App. 3d Cir.1974), for the proposition that notice to a salesman was sufficient to show that a purchase by the principal obligor was not guaranteed by the surety. That case is distinguishable from our present fact situation. In Powell Lumber, the parties had an agreement whereby the surety would review the purchases by the principal obligor on a case by case basis and would then determine whether to provide security for the purchase. In the present case, Peters executed a continuing guaranty and did not reserve the right to review the individual purchases by Quality Built.
Also, we note that decision of this question also turns, in part, on an evaluation of witness credibility. Peters alleges that he informed all parties necessary at Custom-Bilt that he was no longer responsible for the debts of Quality Built. McCook, the official at Custom-Bilt responsible for credit matters, disputed this contention. The duty of the fact finder is to evaluate the credibility when testimony is conflicting and to accept or reject any part of a witness' credibility. Where the testimony conflicts, the fact finder's reasonable evaluation of credibility and reasonable inferences of fact should not be disturbed upon review by the appellate court. Brister v. Continental Insurance Company, 30,429 (La.App.2d Cir.4/8/98), 712 So.2d 177.
In the present case, we find that Peters failed to show that he informed anyone connected with credit matters at Custom-Bilt that he was revoking the continuing guaranty agreement and that he did not intend to be responsible for Quality Built's debts. Peters' action in informing a salesman for Custom-Bilt that he sold his interest in Quality Built was not sufficient to constitute notice of revocation on the continuing guaranty. Therefore, the trial court did not err in its credibility determinations and correctly found that the guaranty had not been revoked and was enforceable.

ATTORNEY FEES
Peters argues that the trial court erred in awarding attorney fees. He contends there was no proof of the amount of attorney fees incurred in this case by the plaintiff. Peters points out that the only affidavit regarding attorney fees was filed in connection with the default judgment against Quality Built. According to Peters, the attorney fee award by the trial court was baseless and excessive. He contends that, if we determine that attorney fees should be awarded, this court should fix the award at a reasonable amount for a routine collection case. Custom-Bilt contends that the trial court has wide discretion *602 in assessing attorney fees and its award should not be reversed, absent a showing of abuse of discretion.
In his brief, Peters argues that the attorney fee award of $2,500 in this case is excessive and is not based upon any evidence contained in the record. Our examination of the judgment fails to show that the trial court awarded attorney fees of 25% of the amount to be recovered. This is the attorney fee amount specified in the continuing guaranty agreement.
Attorney fees are not recoverable except where authorized by statute or contract. Maggio v. Robinson, 31,913 (La.App.2d Cir.5/5/99), 741 So.2d 103; Rivet v. State, Department of Transportation and Development, 96-0145 (La.1996), 680 So.2d 1154. La. C.C. art. 2000 provides in pertinent part:
When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by Article 2924. The obligee may recover these damages without having to prove any loss, and whatever loss he may have suffered he can recover no more. If the parties, by written contract, have expressly agreed that the obligor shall also be liable for the obligee's attorney fees in a fixed or determinable amount, the obligee is entitled to that amount as well. [Emphasis supplied.]
La. R.S. 9:2781 provides in pertinent part:
A. When any person fails to pay an open account within fifteen days after receipt of written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant. If the claimant and his attorney have expressly agreed that the debtor shall be liable for the claimant's attorney fees in a fixed or determinable amount, the claimant is entitled to that amount when judgment on the claim is rendered in favor of the claimant. Evidence of receipt of written demand by the spouse of the debtor, when they are living together as husband and wife, on behalf of the debtor may be introduced as evidence of written demand on the debtor. [Emphasis supplied.]
The prohibition against excessive attorney fees cannot be avoided by fixing the amount of attorney fees as a percentage of the amount to be collected. This court also recognizes that the trial court has much discretion in awarding attorney fees. See Allen v. Burnett, 530 So.2d 1294 (La.App. 2d Cir.1988); Southern Message Service Inc. v. Commercial Union Insurance Company, 26,311 (La. App.2d Cir.12/7/94), 647 So.2d 398, writ denied, 95-0059 (La.3/10/95), 650 So.2d 1180.
When determining the amount of attorney fees to be awarded, the court should consider the following factors: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; (10) the court's own knowledge. See State, DOTD v. Williamson, 597 So.2d 439 (La.1992).
When the nature and extent of services of an attorney are shown by the record, it is the duty of the court to bring to bear its knowledge of the value of the services of counsel and to fix the value even in the absence of expert testimony. Mitchell v. Turner, 588 So.2d 1305 (La. App. 2d Cir.1991); Federal Services Corp. v. Mule-Durel, Inc., 95-2192 (La.App. 4th Cir. 5/15/96), 676 So.2d 597, writ denied, 96-1562 (La.9/27/96), 679 So.2d 1346.
*603 We find that, under the facts of this case, the trial court did not err in awarding the successful plaintiff the amount of attorney fees specified in the continuing guaranty agreement. In the prior default judgment, another judge awarded $1,250.00 in attorney fees. This case went to trial and then was appealed. While the 25% may have been high when awarded, once this court calculates the work performed by the attorney for this appeal, the award is not excessive. The award for attorney fees, consequently, will be affirmed.

MOTION TO REOPEN CASE
Peters objects to the trial court's refusal to reopen the case for the receipt of additional evidence. Peters argues that without the evidence regarding Hattaway's bankruptcy it is unclear from the record as to why Hattaway was excluded from the trial court judgment. We find this argument to be without merit.
The decision to reopen a case for the production of additional evidence after all parties have rested is within the sound discretion of the trial court and will not be disturbed on appeal unless manifestly erroneous. Antley v. Brantly, 28,049 (La. App.2d Cir.2/28/96), 669 So.2d 685.
In this case, we find no error in the trial court's refusal to reopen the case. Reopening the matter was not indicated on the grounds urged by Peters. Hattaway's intent to file for bankruptcy is adequately demonstrated in the record. While it is preferable to take evidence on the attorney fee issue, it was not essential where the court was able to observe counsel's efforts and make a determination of an attorney fee award deemed reasonable under the circumstances presented. We also note that the trial judge reserved Peter's right to litigate his right of contribution from the other defendants.

WRITTEN REASONS FOR JUDGMENT
Peters contends that the trial court erred in failing to give written reasons for judgment even after he filed a formal request. This argument is without merit.
La. C.C.P. art.1917 provides:
In all appealable contested cases, other than those tried by a jury, the court when requested to do so by a party shall give in writing its findings of fact and reasons for judgment, provided the request is made not later than ten days after the signing of the judgment.
In nonjury cases to recover damages for injury, death or loss, whether or not requested to do so by a party, the court shall make specific findings that shall include those matters to which reference is made in Paragraph C of Article 1812 of this Code. These findings need not include reasons for judgment.
Even if the trial judge has failed to give any reasons, the judgment will not be reversed. The litigant's remedy in such a situation is to apply for supervisory writs or to move for a remand to compel the trial judge to comply with La. C.C.P. art. 1917. Lowe v. Continental Insurance Company, 437 So.2d 925 (La.App. 2d Cir. 1983), writ denied, 442 So.2d 460 (La. 1983), cert. denied, 466 U.S. 942, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984). In this case, Peters did not follow the required procedure. Further, at this point, after reviewing the law and evidence in this case and deciding the matter on the merits of the substantive issues raised, the trial court's reasons for judgment are not necessary.

PARTIAL FINAL JUDGMENT
Peters contends that this is an improper partial judgment. He argues that the judgment did not dispose of all the issues in the matter, did not comport with La. C.C.P. art. 1915 and was not certified by the trial court as an appealable partial final judgment.
*604 Regarding partial final judgments, La. C.C.P. art. 1915 provides as follows:
A. A final judgment may be rendered and signed by the court, even though it may not grant the successful party or parties all of the relief prayed for, or may not adjudicate all of the issues in the case, when the court:
(1) Dismisses the suit as to less than all of the parties, defendants, third party plaintiffs, third party defendants, or intervenors.
(2) Grants a motion for judgment on the pleadings, as provided by Articles 965, 968, and 969.
(3) Grants a motion for summary judgment, as provided by Articles 966 through 969, including a summary judgment granted pursuant to Article 966(E).
(4) Signs a judgment on either the principal or incidental demand, when the two have been tried separately, as provided by Article 1038.
(5) Signs a judgment on the issue of liability when that issue has been tried separately by the court, or when, in a jury trial, the issue of liability has been tried before a jury and the issue of damages is to be tried before a different jury.
B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the claims, demands, issues, theories, or parties, whether in an original demand, reconventional demand, cross-claim, third party claim, or intervention, the judgment shall not constitute a final judgment unless specifically agreed to by the parties or unless designated as a final judgment by the court after an express determination that there is no just reason for delay.
(2) In the absence of such a determination and designation, any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties and shall not constitute a final judgment for the purpose of an immediate appeal. Any such order or decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.
C. If an appeal is taken from any judgment rendered under the provisions of this Article, the trial court shall retain jurisdiction to adjudicate the remaining issues in the case.
As we stated in Succession of Grimmett, 31,975 (La.App.2d Cir.3/5/99), 738 So.2d 27, prior to the 1997 amendments, La. C.C.P. art. 1915 dealt with the problem of identifying immediately appealable partial final judgments by setting forth exclusive classes of such judgments. The difference between the former approach and the post-amendment approach has been described as follows:
The new version of Article 1915, although still containing a list of partial adjudications, largely has abandoned the prior approach in favor of one closely paralleling Federal Rule of Civil Procedure 54(b). Under the federal approach, the immediate appealability of a partial final decision essentially is left to the discretion of the trial judge who knows the case and can balance competing factors. This approach allows greater flexibility to fit the particular case, but also allows for greater judge-to-judge differences in application, as long as the differences fall within the judges' broad discretion.
Mark Tatum and William Norris, III, Summary Judgment and Partial Judgment in Louisiana: The State We're In, 59 La. L.Rev. 131 (1998), as cited in Succession of Grimmett, supra.
Trial courts should give written reasons for La. C.C.P. art. 1915(B) certification in order to facilitate appellate review. Banks v. State Farm Insurance Company, 30,868 (La.App.2d Cir.3/5/98), *605 708 So.2d 523. The proper standard of review of the trial court's order finding that a judgment is immediately appealable, when that order is accompanied by reasons, is whether the trial judge abused his discretion. When no reasons are given, the court is to review the propriety of the certification de novo considering generally the criteria set forth in Banks v. State Farm Insurance Company, supra. Succession of Grimmett, supra; Perricone v. East Jefferson General Hospital, 98-343 (La.App. 5th Cir. 10/14/98), 721 So.2d 48. In Banks v. State Farm Insurance Company, supra, this court listed the following factors to be applied in determining whether a partial judgment is immediately appealable:
(1) The relationship between the adjudicated and unadjudicated claims;
(2) The possibility that the need for review might or might not be mooted by future developments in the district court;
(3) The possibility that the reviewing court might be obliged to consider the same issue a second time;
(4) The presence or absence of a claim or counterclaim which could result in setoff against the judgment sought to be made final; and
(5) Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.
In the present case, the trial court rendered a partial judgment finding Peters liable to Custom-Bilt, but reserving Custom-Bilt's rights as to Hattaway and reserving Peters' rights as to Hattaway and Quality Built. Contrary to Peters' argument, the trial court did certify this as an appealable final judgment, finding there was no just reason for delay. However, the trial court did not give written reasons for its decision in certifying the matter as an appealable final judgment. Therefore, we will review that decision de novo. Under the factors outlined in Banks, the adjudicated and unadjudicated claims arise out of the same facts, but adjudication of Custom-Bilt's claim against Peters will in no way affect a later determination of Peters' claims against Hattaway and Quality Built. Further, there is no possibility that the need for review will be mooted by future developments in the district court. Also, the claims of Peters against Hattaway and Quality Built are for indemnity and contribution. Peters has raised no claim that could result in a set off against Custom-Bilt. It appears that the sole reason the trial court failed to adjudicate the claims against Hattaway and Quality Built was the fact that Hattaway filed for bankruptcy, staying any further action against him in state court. Under the circumstances, the trial court acted properly and in accordance with principles of judicial economy by disposing of those matters which could be ruled upon.
We find that the trial court did not abuse its discretion in issuing and certifying as appealable a partial final judgment, reserving the rights of Peters and Custom-Bilt against Hattaway, as well as those of Peters against Quality Built. Accordingly, we find Peters' argument that the trial court pronounced a non-appealable partial final judgment is without merit.

CONCLUSION
For the reasons stated above, we affirm the trial court judgment in all respects. Costs in this court and in the court below are assessed to David Randal Peters.
AFFIRMED.